UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**SAMUEL KOTTKE**,                                    Case No. 6:15-cv-00927-KI

          Plaintiff,                          OPINION AND ORDER

    v.

**CAROLYN W. COLVIN, Acting
Commissioner of Social Security**,

          Defendant.

    Bruce W. Brewer
    P.O. Box 421
    West Linn, OR 97068

          Attorney for Plaintiff

    Billy J. Williams
    United States Attorney
    District of Oregon
    Janice E. Hebert
    Assistant United States Attorney
    1000 SW Third Ave., Ste. 600
    Portland, OR 97204-2902

John C. Lamont
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Ste. 2900 M/S 221A
Seattle, WA 98104-7075

      Attorneys for Defendant

KING, Judge:

Plaintiff Samuel Kottke brings this action pursuant to section 205(g) of the Social

Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the

Commissioner denying his applications for disability insurance benefits ("DIB") and

supplemental security income benefits ("SSI"). I affirm the decision of the Commissioner.

## BACKGROUND

Kottke filed applications for DIB and SSI on May 2, 2011, alleging disability beginning

February 1, 2006. The applications were denied initially and upon reconsideration. After a

timely request for a hearing, Kottke, represented by counsel, appeared and testified before an

Administrative Law Judge ("ALJ") on July 31, 2013.

On August 19, 2013, the ALJ issued a decision finding Kottke not disabled within the

meaning of the Act and therefore not entitled to benefits. This decision became the final decision

of the Commissioner when the Appeals Council declined to review the decision of the ALJ on

March 24, 2015.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits

to people who have contributed to the Social Security program and who suffer from a physical or

PAGE 2 - OPINION AND ORDER

mental disability.  42 U.S.C. § 423(a)(1).  In addition, under the Act, supplemental security

income benefits may be available to individuals who are age 65 or over, blind, or disabled, but

who do not have insured status under the Act.  42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to

cause death or to last for a continuous period of at least twelve months.  42 U.S.C.

§§ 423(d)(1)(A) and 1382c(a)(3)(A).  An individual will be determined to be disabled only if his

physical or mental impairments are of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A) and

1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for

determining if a person is eligible for either DIB or SSI due to disability.  The evaluation is

carried out by the ALJ.  The claimant has the burden of proof on the first four steps.  *Parra v.*

*Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920.  First, the ALJ

determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R.

§§ 404.1520(b) and 416.920(b).  If the claimant is engaged in such activity, disability benefits are

denied.  Otherwise, the ALJ proceeds to step two and determines whether the claimant has a

medically severe impairment or combination of impairments.  A severe impairment is one

"which significantly limits [the claimant's] physical or mental ability to do basic work

activities[.]"  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe

impairment or combination of impairments, disability benefits are denied.

PAGE 3 - OPINION AND ORDER

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  *Parra*, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work.  20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards.  *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance.  *Id.* (internal quotation omitted).  The court must uphold the ALJ's

findings if they "are supported by inferences reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations. *Id.*

## THE ALJ'S DECISION

The ALJ identified the following impairments as severe:  left knee medial plica, right knee chondromalacia medial femoral condyle and synovitis, lumbar spine degenerative disc disease, smoking related chronic obstructive pulmonary disease (COPD)/emphysema with moderate airflow obstruction, alpha 1 antitrypsin phenotype, obstructive sleep apnea, and morbid obesity.  The ALJ found these impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.

Despite these impairments, the ALJ determined Kottke retains the residual functional capacity ("RFC") to perform a range of sedentary work.  He can frequently climb ramps and stairs, as well as ladders, ropes, and scaffolds.  He can frequently kneel, crouch, and crawl.  He can occasionally stoop.  He has no balance limitations, although he should avoid concentrated exposure to pulmonary irritants such as fumes, odors, dust, gases, and poor ventilation.  Based on this RFC, and the testimony of a vocational expert ("VE"), the ALJ concluded Kottke could perform his past relevant work as a telephone solicitor.  He could also perform other work in the national economy, such as cashier II, call out operator, and bench hand.  As a result, the ALJ found Kottke not disabled under the terms of the Act.

## FACTS

Kottke, 29 years old on his alleged disability onset date, completed high school and some college course work.  He had worked as a telemarketer, an automotive parts technician, and at

stocking shelves.  His last job, working with the Grande Ronde tribe, had him making copies of

files and delivering and sorting mail.  He testified that he stopped working because of his back

pain, but reported elsewhere that the work was an internship which ended.

Kottke's medical record is extensive from 2006 to the fall of 2009, with a gap in

treatment until December 2010.  I summarize only the relevant medical history here.  Kottke

sought care for breathing difficulties, GERD, right upper quadrant pain, and back pain in 2006.

During this time, Kottke regularly reported back pain in the 6-7/10 range, for which he was

prescribed oxycodone and then MS Contin.  John French, M.D., provided rehabilitation services

for his back and knee pain, including prescribing physical therapy and water aerobics.  The

doctor decreased the short-acting oxycodone in April 2006 and agreed to see him on an as needed

basis; at that point, Kottke was tolerating his medications well.

Kottke was attending courses at Chemeketa Community College and reported that he

"apparently flunked a course because his pain problems prevented him from sitting in class for

extended period of time." Tr. 563.  At Kottke's request, Joseph Whitson, D.O., wrote a letter

noting that Kottke was being seen "for chronic pain in his back and knees that has been attributed

to degenerative disease and patellofemoral syndrome.  Work up and evaluation is still ongoing

but these problems certainly can hinder his ability to sit through class and maintain concentration

in order to adequately perform academically." Tr. 656.  Dr. Whitson indicated in the chart note

that he dictated the letter in Kottke's presence and that the patient was "in agreement with the

content of this letter[.]" Tr. 563.  At this time, Dr. Whitson encouraged exercise, such as water

aerobics, to help Kottke lose weight.  The next month, Dr. Whitson initiated a "long discussion"

PAGE 6 - OPINION AND ORDER

about the usefulness of the MS Contin since Kottke continued to report the same pain level

despite increasing doses of pain medication.  Tr. 560.  Dr. Whitson urged weight loss.

Kottke continued his studies at Chemeketa in 2007.  He used Duragesic patches for pain

relief.  In March 2007, at the request of Dr. Whitson, Craig Anderson, M.D., examined Kottke.

Kottke was tender to palpation in the right lower lumbar paraspinal area.  Kottke felt pain with

extension at 10 degrees and flexion at 30 degrees.  He could bend laterally about 15 degrees each

way, the SI joints and sciatic notches were nontender, and the straight leg raising test was

negative.  Strength was 5/5 and Kottke's gait was normal.  Dr. Anderson recommended x-rays

and facet joint injections.  The x-rays showed degenerative disc space narrowing at L5-S1 and

the injections were unsuccessful.  Dr. Anderson then scheduled a lumbar discography, which

Kottke's insurance declined.

Kottke experienced an episode of nausea and vomiting during the summer of 2007, the

etiology of which was unclear.  It was thought to be caused by Crohn's colitis or GERD.

Kottke continued to use the Duragesic patches and reported his pain level was "well

controlled by medication" as of September 2007.  Tr. 516.  Kottke was referred to Jason Mauer,

M.D., for a pain evaluation, and a pulmonologist for his breathing problems.  The pulmonologist

noted Kottke's lung function testing showed a moderate degree of airflow obstruction.  Kottke

could take out the trash and clean the house, but "running after his 4-year-old son can get him

quite breathless and he immediately starts wheezing."  Tr. 363.  The pulmonologist

recommended weight loss and a sleep clinic, and prescribed Singulair along with the Advair

Kottke was already taking.

Kottke told Dr. Mauer when he met with him in November 2007 that his low back pain was 80% of his complaint. At best, his back pain was at 2/10, and at worst 8/10. Standing for longer than 45 minutes to an hour caused pain, as did walking for more than an hour, or sitting for more than 45 minutes. He reported working at his computer with an ergonomic chair; he did not lie down during the day. He wanted to return to work and be able to spend time with his kids without pain. He reported his occupation as "customer service agent, a job he is not particularly pleased with." Tr. 473. He could walk without antalgia, heel walk, toe walk, and partially squat and rise without pain. Dr. Mauer suggested tapering his Duragesic, trying Neurontin, trigger point injections, and a daily walking plan with low back stretches.

Dr. Mauer continued to urge Kottke to walk more each day; in December, Kottke was walking his son to school and going to the local store two to three blocks away every day. Kottke reported 4/10 on the pain scale with the Duragesic patches in January 2008. He was able to walk, work on the computer, and play with his kids. Medial branch blocks at L3, L4, and L5 were unsuccessful. By February, Kottke was reporting average pain in the 2-3/10 range, although he experienced a flare up after lifting his son. He reported in March 2008 spending most of his day with his home computer business. Tr. 483. At his April and May appointments with Dr. Mauer, Kottke continued to report average pain of 2/10, he was walking almost daily, his gait continued to be nonantalgic, his squat and rise was limited only by his weight, and he reported being able to take care of daily chores and his children. A lumbar discography revealed painful concordant disks 7+/10 at L2-3, L3-4, L4-5, and L5-S1, with evidence of posterior fissuring at L3-4 and L4-5. A surgeon did not believe Kottke was a good surgical candidate, however.

PAGE 8 - OPINION AND ORDER

Kottke reported spending his days taking care of his children, transporting them to and from school, performing light housework, repairing computers, and gardening.  Tr. 486.  He reported stopping work and school because of his low back pain and inability to sit.  Dr. Mauer referred Kottke to Eric Long, M.D., recommended physical therapy, and urged a multidimensional approach to pain to include weight loss, psychological treatment, and other therapies.  Kottke continued to report pain levels at 2-3/10 in July, August, and September.  Dr. Mauer continued to urge weight loss and physical conditioning, and opined that Kottke perceived himself as disabled.

Kottke told his gastroenterologist in September 2008 that his medications adequately addressed his GERD, his Crohn's colitis, his right upper quadrant pain, and his epigastric pain; the vomiting and nausea had resolved,

Dr. Long reviewed the discography results with Kottke, noting posterior annular tears at L2-3, L3-4, L4-5 and L5-S1.  He agreed Kottke was not a good surgical candidate, but thought he might benefit from plasma discectomy.  The chart note reflects Kottke's work status as "disabled."  Tr. 406.

Dr. Long saw Kottke in November 2008, and January and February 2009.  Kottke reported taking care of his children, who were 5 and 6 years old, in the afternoons and evenings. Dr. Long referred Kottke to physical therapy to institute an independent exercise routine, and agreed to explore whether homemaking assistance might be available during the three-week recovery period from nucleoplasty.  During this time, the doctor reported Kottke's work status as "currently unfit for regular or modified work due to multilevel lumbar disc disruption and congenital emphysema."  Tr. 402 (11/18/2008); Tr. 400 (1/14/2009); Tr. 398 (2/11/2009).

PAGE 9 - OPINION AND ORDER

Kottke attended physical therapy once during this time.  By February 2009, Kottke was caring for his children all the time on his own.

Dr. Mauer opined that Kottke "lacks significant motivation with respect to self-management and appears to have a primarily passive attitude towards his pain treatment."  Tr. 501.  In February, Dr. Mauer noted Kottke sat with poor posture, could transition to standing without difficulty, and walked without gross antalgia.  Dr. Mauer again noted Kottke had "shown little personal desire to improve his function.  He appears to be poised to accept long-term disability[.]"  Tr. 499.  Dr. Mauer felt he no longer had anything to offer Kottke and transferred opioid prescribing to Hal Mitchell, D.O., but urged tapering since Kottke had not demonstrated functional improvement on the medication.

Dr. Mitchell saw Kottke in March 2009 and felt that the medication *had* benefitted Kottke as he had increased his activity, had lost weight, and was operating a business repairing and selling computers, all while caring for his two children on his own.  Kottke reported the medication took his pain level down from 5 to 2.  Nevertheless, a pain management committee concluded Kottke had violated his pain management contract on several occasions (seeking medication at the emergency room, using several different pharmacies, and taking left-over medications prescribed earlier).  Dr. Mitchell tapered him off the Duragesic beginning in April 2009.

Kottke complained of upset stomach and nausea due to increased ibuprofen use in May 2009.  His gastroenterologist gave him Choline Magnesium Trilisate to improve his nausea and GI upset.

PAGE 10 - OPINION AND ORDER

Dr. Long referred Kottke to a surgeon for consideration of an L3-4 and L4-5 percutaneous disc decompression. Barbara Mallett, M.D., noted nonantalgic gait, no difficulty bearing weight on his toes, no discrete areas of tenderness on lumbar spine but pain with lumbar extension, and motor strength 5/5 bilaterally. The doctor agreed to investigate authorization for the percutaneous disc decompression. Kottke's insurance would not cover the procedure.

More than a year later, in December 2010, Kottke established care with Ryan Cooley, M.D. Kottke had been taking ibuprofen for his pain, which irritated his stomach. Kottke sought Duragesic, remembering that it worked well to control his pain. Kottke's gait was normal, but he was tender in the midline of his spine. Dr. Cooley referred Kottke to the comprehensive pain management clinic. When Ahmed Ebeid, M.D., examined Kottke in January 2011, he displayed a restricted range of motion of the lumbar spine in all directions. He was tender in the midline. Dr. Ebeid recommended long-acting anti-inflammatories and Relafen (an NSAID). A subsequent MRI revealed disc extrusions at L4-5 and L5-S1 with an annular fissure at L3-4, without obvious nerve root impingement. Tr. 763.

In April 2011, Kottke told Dr. Cooley he was trying job retraining, but said he could not sit in the classes for more than ten minutes at a time. "I did fill out his exclusion form today for state vocational rehab to excuse him for now." Tr. 488. Dr. Cooley referred Kottke to Dr. Long to evaluate for surgery. The doctor did not approve Oxycodone, but continued NSAIDs. At his appointment with Dr. Cooley in July 2011, Kottke reported Dr. Long was not returning his calls. He was continuing to use ibuprofen for pain.

Dr. Ebeid noted in October 2011, after the MRI, that "no discrete pathology [had been] found to explain his pain." Tr. 867. The doctor continued to recommend against opioids and

encouraged a multidisciplinary program or spinal cord stimulation; Kottke did not wish to see the doctor again.

Dr. Cooley's October 2011 note indicated Kottke's dispute with Dr. Ebeid came down to the need for narcotics until the spinal cord stimulator was implanted. Kottke reported radiating pain down his legs and numbness in his big toes. Upon examination, Kottke displayed a diffusely tender lumbosacral spine with positive straight leg raise bilaterally, and slightly diminished light-touch sensation of great toes. Dr. Cooley agreed to put him on an opiate contract for Vicodin.

Two days later, Kottke told his therapist that the disagreement with his pain doctor had resulted in "more clear and coherent care" and he had found "more energy to get more active and is doing more chores around the house." Tr. 820.

Kottke did not return to Dr. Cooley until August 2012, at which time he reported continuing to use Vicodin for his pain. Kottke had not been considered a good candidate for surgery, and he did not end up going to see anyone else about the recommended injections. He could not transfer from the chair to table without pain, and he had a very antalgic gait. He had a cough.

Kottke returned to a pulmonologist and reported his activity level was limited by his back pain. He could stand for 20 minutes. He could walk approximately three blocks. He was started on prednisone and was told to quit smoking. At a follow-up appointment, he reported the prednisone had not helped, but he had not quit smoking either. The pulmonologist told Kottke there was no point in coming back if he could not commit to smoking cessation. Dr. Cooley, in April 2013, noted Kottke's antalgic gait, reported the spinal cord stimulator was no longer

PAGE 12 - OPINION AND ORDER

covered by the state health plan, and that Kottke was not approved for any other pain

management visits.  The doctor urged smoking cessation.  Kottke complained of significant pain,

and difficulty lying in bed, but that he tried to remain as active as he could.  He continued using

Vicodin for pain relief.

## DISCUSSION

Kottke challenges the ALJ's rejection of Dr. Long's, Dr. Cooley's, and Dr. Whitson's

opinions.  The ALJ addressed these medical opinions as follows:

> I have given little weight to the following medical opinions:
>
> > (1)  Dr. Long's 2009 opinion that the claimant was unfit for regular or
> > modified work due to his back and respiratory impairments;
> >
> > (2)  To the extent it suggests more severe limitations than set forth in the
> > residual functional capacity, Dr. Cooley's April 2011 assessment
> > indicating that the claimant was excused from state vocational
> > rehabilitation services due to his pain and inability to sit for longer than 10
> > minutes at a time.
> >
> > (3)  To the extent it suggests more severe limitations than set forth in the
> > residual functional capacity, Dr. Whitson's June 2006 assessment that the
> > claimant's back and knee impairments could hinder his ability to sit
> > through class and to maintain concentration[.]
>
> . . .
>
> Dr. Long's, Dr. Cooley's, and Dr. Whitson's opinions are inconsistent with the
> claimant's longitudinal treatment history, his performance on physical
> examinations, and his independent daily activities including caring for his
> children as set forth above.  He has consistently been neurologically intact with no
> motor strength or sensory deficit.  Dr. Long's, Dr. Cooley's, and Dr. Whitson's
> opinions were based in large part on the claimant's self-report of mobility
> problems and pain, but, as noted, he is not entirely credible.

Tr. 26-27.

PAGE 13 - OPINION AND ORDER

The ALJ relied instead on the state agency consultants' opinions.  Tr. 26.  Neal Berner, M.D., reviewed the MRIs from 2005, 2007, and 2011.  He noted Kottke's "gait is inconsistently antalgic, but strength and sensation remain intact."  Tr. 64-65.  He felt that Dr. Long's opinion relied on Kottke's reports and was not consistent with the record.  He thought Kottke could perform light work.  Similarly, Mary Ann Iyer, M.D., concluded Kottke could perform light work, with some restrictions, relying on Kottke's improved energy and his activities around the house.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician.  More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual.  *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007).  If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons.  *Id.* (treating physician); *Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician).  Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record.  *Orn*, 495 F.3d at 632; *Widmark*, 454 F.3d at 1066.  The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician.  *Widmark*, 454 F.3d at 1066 n.2.  Since Kottke's physicians' opinions are contradicted by the state agency consulting physicians' opinions, the ALJ was required to give specific and legitimate reasons, supported by substantial evidence in the record, to give less weight to them.

PAGE 14 - OPINION AND ORDER

As an initial matter, although Kottke contends the ALJ erred by failing to address each opinion separately, I find the ALJ's reasoning is sufficiently specific to allow me to review the decision. *See Beers v. Colvin*, No. 2:15-CV-01084-RSL-DWC, 2016 WL 3189997, at *4 (W.D. Wash. May 11, 2016) (plaintiff provides no authority requiring ALJ to discuss medical opinions in any specific manner). While the ALJ combined her analysis of the three doctors, it is clear she considered all three opinions and that her reasoning applied equally to each of the opinions.

Additionally, although Kottke contends the ALJ was required to discuss the treating physicians' opinions using the six factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6), the ALJ need not reference each factor. *See Harris v. Colvin*, 584 F. App'x 526, 527 n.1 (9th Cir. Aug. 15, 2014) (unpublished) (citing SSR 06-03p, 2006 WL 2329939, at *5 ("[n]ot every factor for weighing opinion evidence will apply in every case")). When a treating or examining physician's opinion is contradicted, the ALJ may reject the opinion by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).

I.    <u>Dr. Long</u>

Kottke argues the ALJ erred in rejecting Dr. Long's opinion because Dr. Long is a specialist in physical medicine who carefully examined Kottke. Kottke disputes that the ALJ's general reference to an inconsistency with the longitudinal treatment history, and an unspecified conflict with Dr. Long's physical examination and Kottke's daily activities, are specific and legitimate reasons supported by substantial evidence in the record. Additionally, Kottke disputes that the record reflects Dr. Long relied on Kottke's subjective complaints in formulating his opinion.

Although Kottke argues the ALJ erred, he does not identify how the ALJ incorrectly summarized the medical record.  To the contrary, as the ALJ noted, during the time Dr. Long treated Kottke (in August and November 2008, and January and February 2009), Kottke reported pain levels of 2-3/10 to Dr. Mauer, with occasional flare-ups, or noted no significant change over those months.  *See* Tr. 25; Tr. 478 (8/26/2008); Tr. 489 (9/23/2008); Tr. 491 (10/21/2008); Tr. 493 (11/18/2008); Tr. 494 (12/16/2008); Tr. 500 (1/14/2009); Tr. 497 (2/11/2009).  During this time, Kottke could transition from sitting to standing without difficulty and walk without antalgia.  *Id.*  The ALJ could rationally conclude Dr. Long's statement that Kottke was "unfit for work" was unsupported and contradicted by the medical record.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) ("ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence"); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (contradictory clinical findings may be specific and legitimate reason).

Additionally, although Kottke disputes that the ALJ was not sufficiently specific about which daily activities contradicted Dr. Long's opinion, the ALJ listed Kottke's activities in detail, all of which the ALJ could rationally conclude contradicted Dr. Long's opinion that Kottke was unfit for work.  *See* Tr. 21-22 (breathing problems when running after four-year-old son, caring for young children without assistance, attending community college, running a home computer business, household chores, gardening, etc.); *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014) (inconsistency between daily activities and a treating provider's opinion may constitute specific and legitimate reason to discount opinion).

The ALJ did not err in his assessment of Dr. Long's opinions.

PAGE 16 - OPINION AND ORDER

II.    Dr. Cooley

Kottke reiterates that an inconsistency with the longitudinal treatment history is insufficiently specific to suffice here.  Further, he argues, Dr. Cooley relied on the MRI revealing "multi-level degenerative disc disease," bulging discs with annular tears, and worsening foraminal stenosis, in forming his opinion.  Tr. 788.  Similarly, according to Kottke, Dr. Cooley's opinion was consistent with his notations of Kottke's tenderness and antalgic gait, and the ALJ did not explain how normal motor, sensory, and neurological findings undermined Dr. Cooley's opinion.  Tr. 789.  Finally, Kottke argues the ALJ may not generally reference daily activities without specifying why the nature, frequency, extent or duration of the activities is inconsistent with the doctor's opinion.

As the Commissioner notes, the ALJ could rationally conclude from Dr. Cooley's treatment notes that the doctor relied on Kottke's statements in offering an opinion that Kottke should be excused from state vocational rehab "for now."  Tr. 788.  Dr. Cooley explicitly documented the following:  "he says he cannot sit in the classes for more than 10 minutes at a time, and is not in a position to work due to his pain, at least until he can get seen[.]"  Thus, the ALJ's finding is supported by inferences reasonably drawn from the record.  *Molina*, 674 F.3d at 1110; *see also Tommasetti*, 533 F.3d at 1041 (a physician's opinion of disability may be rejected if it is "based to a large extent on a claimant's self-reports that have been properly discounted as incredible").

Further, Dr. Cooley referred Kottke to Dr. Ebeid for a comprehensive pain assessment, and that doctor recommended only an anti-inflammatory and NSAIDs, and commented that "no discrete pathology [had been] found to explain his pain."  Tr. 867.  Finally, the ALJ permissibly

referenced Kottke's reports of having "more energy to get more active" and "doing more chores around the house," which tended to contradict Dr. Cooley's conclusion that Kottke could not work.  Tr. 22, citing 820.

Accordingly, the ALJ's reasoning is specific and legitimate and is supported by substantial evidence in the record.

III.    Dr. Whitson

Again, Kottke reiterates the ALJ's failure to specify how the longitudinal history is inconsistent with Dr. Whitson's opinion, how Dr. Whitson's physical examinations do not support his opinions, and what evidence suggests the doctor relied on Kottke's complaints.

Contrary to Kottke's argument, the ALJ noted Kottke's March 2006 appointment with Dr. French, just two months before Dr. Whitson gave his opinion, in which Kottke reported tolerating a decrease in his short-acting OxyContin.  Tr. 24, citing Tr. 302.  Additionally, as the ALJ implies by her comment "to the extent it suggests more severe limitations than set forth" in the RFC, Dr. Whitson did not identify any specific limitations for consideration.  He merely stated that back pain "can" affect sitting and concentration in class, but that "work up and evaluation is still ongoing[.]"  Tr. 656.  Further, as the ALJ noted, Kottke continued to attend classes in 2006 and 2007, and then operated a home computer business.  Tr. 22.  Finally, reading Dr. Whitson's letter in the context of his chart note, the ALJ's conclusion that Dr. Whitson relied on Kottke's self-report is supported by substantial evidence.  *See* Tr. 563 (dictated letter in Kottke's presence and Kottke "in agreement with the content of the letter").  These are all specific and legitimate reasons, supported by substantial evidence in the record, to affirm the ALJ's finding.

PAGE 18 - OPINION AND ORDER

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards. For these reasons, the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

DATED this ___15th___ day of August, 2016.


      _/s/ Garr M. King_____

Garr M. King
United States District Judge


PAGE 19 - OPINION AND ORDER